**Ruth MARTELL and Nancy DesLauriers, Plaintiffs,**

v.

**Tommy G. THOMPSON, Secretary, Department of Health and Human Services, and the United States of America, Defendants.**

No. A4–04–067.

United States District Court,
D. North Dakota,
Northwestern Division.

July 22, 2005.

Donald G. Bruce, Belcourt, ND, for Plaintiffs.

Shon Hastings, U.S. Attorney's Office, Fargo, ND, David L. Peterson, U.S. Attorney's Office, Bismarck, ND, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

Before the Court is the Defendants' Motion for Summary Judgment filed on April 1, 2005. For the reasons set forth below, the Defendants motion is granted.

## I. *BACKGROUND*

On May 21, 2004, the plaintiffs, Ruth Martell (Martell) and Nancy DesLauriers (DesLauriers) filed their complaint with this Court alleging that they had been discriminated against on the basis of their race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et. seq. A reference to the Federal Tort Claims Act is also made in the complaint. 28 U.S.C. §§ 2671–2680. The defendant was served on May 27, 2004, and filed an answer on July 26, 2004. Fact discovery is complete and the expert witness discovery closed on March 28, 2004. Trial is scheduled for October 31, 2005.

Martell and DesLauriers are registered nurses employed by the Indian Health Service (IHS) at the Belcourt Public Health Service Indian Hospital in Belcourt, North Dakota (Belcourt Hospital). IHS is a component of the United States Department of Health and Human Services, an agency of the United States. Martell and DesLauriers are both white. It is alleged that their Native American supervisor, Cheryl LaVallie, discriminated against them based upon their race when LaVallie reported them to the North Dakota Board of Nursing for altering medical records.

From October 2002 through March 2003, and at other times as well, Martell and DesLauriers were assigned to work in the Emergency Room at the Belcourt Hospital. On October 25, 2002, a male patient with a history of heart disease, who advised DesLauriers that he was scheduled for heart surgery in Minot in a few days, presented to the Belcourt Hospital emergency room. The patient (hereinafter referred to as Patient # 10051) complained of back and chest pain. The employment dispute at issue in this case arises from confusion regarding the time of day that Patient # 10051 arrived at the Emergency Room.

The medical records originally indicated that Patient # 10051 arrived at the Emergency Room at 16:32 hours or 4:32 p.m. The "time of arrival" entry for Patient # 10051 on the Emergency Room Log and the Discharge Summary is 16:32 hours. The Nursing Treatment Record, in its

original form, reveals that DesLauriers evaluated Patient # 10051 at 16:50 hours.

It is undisputed that on some date after October 25, 2002, DesLauriers crossed out the time entries on the Discharge Summary, the Ambulatory Encounter Record, and the Nursing Treatment Record in Patient # 10051's chart. Beside the crossed-out entries DeLauriers wrote "error;" entered "17:32" on the Ambulatory Encounter Record and Discharge Summary, and "17:50" on the Nursing Treatment Record; and initialed the new entries. DesLauriers also revised the Emergency Room Log to reflect a new time of arrival of 17:32 rather than 16:32, by writing over the original entry. It is undisputed that DesLauriers followed proper procedure in making those changes. A summary of the relevant medical records is as follows:

| Records | Revision Made | Original Entry | Revised Entry |
|---|---|---|---|
| PCC Ambulatory Encounter Record | Arrival Time | 16:32 | 17:32 |
| Emergency Room Log | Arrival Time | 16:32 | 17:32 |
| Discharge Summary | Arrival Time | 16:32 | 17:32 |
| Nursing Treatment Record | Time | 16:50 | 17:50 |
| PCC Ambulatory Encounter Record | "Time into E.R."/ Time seen by physician | 18:00 | NA |

On November 5, 2002, Dr. Penny Wilkie received a letter from the relative of a patient (presumably Patient # 10051) who had been treated in the Emergency Room on October 25, 2002, complaining about the delay in his treatment. Dr. Wilkie reviewed Patient # 10051's records; noticed the time alteration in the chart; contacted Shelly Harris, the Acting Director of Nursing; and requested that she investigate the basis for the alteration. Shelly Harris reviewed the medical records listed above, found the alterations, discovered that DesLauriers had revised the time on the records in at least one other patient's chart, and discovered that DesLauriers was looking for records in a third patient's chart with the intent to revise them as well. DesLauriers' decision to change the times on the medical records and log was prompted by Ruth Martell.

On November 5, 2002, Shelly Harris spoke with DesLauriers and Martell about the record alterations. Harris requested that they prepare a written explanation of these events, which both women prepared and initialed the same day. Martell explained that she had reviewed the Emergency Room Log and discovered what she believed to be an incorrect arrival time for Patient # 10051 and other patients as well. Martell did not alter the times recorded on the Emergency Room log or on the other medical records. Martell wrote a message to DesLauriers on a "sticky" (post-it note) suggesting that DesLauriers review the matter and put the note on the Emergency Room Log. Martell also called DesLauriers to advise her of the potential error. In addition, Martell left a note for the Emergency Room Supervisor, Shareen Parisien.

Martell discovered the error because she had to review the Emergency Room Log while preparing a memorandum to the supervisor of lab technician, Doris DeCoteau, who was "on call" but failed to respond to repeated telephone calls and a voice-mail message on the evening of October 25, 2002. Martell prepared the memorandum reporting this professional deficiency upon the request of her supervisor, Shareen Parisien. Both Martell and DesLauriers

contend that this report was one of the reasons LaVallie sent a letter to the North Dakota Board of Nursing advising the board of a potential violation.

Sometime after receiving notification of the potential error, DesLauriers reviewed the records and revised the times in accordance with hospital policy. When questioned by Harris about the alteration of medical records, DesLauriers admitted that she had changed the time on the medical records in Patient # 10051's chart, and changed the time on at least one other chart as well. DesLauriers also advised that she had made similar errors in time notations on a third chart, but that she had not changed those records because she had been unable to find them. DesLauriers blames the time confusion on new glasses, a new watch, and the end of daylight savings time.

On November 6, 2002, Harris notified Supervisor Shareen Parisien of the alteration of the medical records and together they went to the Maintenance Department at the Belcourt Hospital to review the security videotapes for October 25, 2002. After viewing the videotapes, Harris and Supervisor Parisien concluded that Patient # 10051 had presented to the Emergency Room at 16:32 hours as originally charted on the patient's medical records and that DesLauriers' time alteration to the records was unnecessary. Martell and DesLauriers dispute this fact and contend that the security tapes are too blurry to be of assistance.

Patient # 10051 died from an anaphylactic reaction to anesthesiology at Trinity Medical Center in Minot, North Dakota just days after being treated at the Belcourt Hospital. Although the patient had been under the care of a hospital not affiliated with the Belcourt Hospital or the United States Government when he died, there was some discussion among the Belcourt Hospital staff about the cause of his death. According to a statement from Carol J. Hunt, Medical Record Administrative Specialist, DesLauriers came to her looking for Patient # 10051's chart on October 31, 2002, six days after he was treated in the Emergency Room, and two or three days after he had passed away. When DesLauriers asked whether Hunt knew where Patient # 10051's chart was, DesLauriers explained that it was the chart for "the guy that died the other day." Hunt then advised DesLauriers that the chart was probably on Dr. Wilkie's desk, to which DesLauriers commented, "Oh, that's probably where they're at because I'm sure this is going to be a problem." Based upon this information, Harris inferred that DesLauriers was concerned about the length of time it took to treat Patient # 10051 on October 25, 2002, (1 hour and 36 minutes if the original times were correct), and may have altered the times in the medical records to reflect a shorter delay.

After Shelly Harris completed her investigation, she submitted a report to the Director of Nursing, Cheryl LaVallie. LaVallie is a Native American. On November 12, 2002, LaVallie submitted the investigation report to Denise Goodface, Employee Relations Specialist in the Aberdeen Area Office of IHS, along with a memorandum outlining the findings and explaining the concerns raised by the alteration/falsification of medical records. In this memorandum, LaVallie indicated that she intended to report this matter to the North Dakota Board of Nursing. LaVallie testified in her deposition that Dr. Penny Wilke (clinical director and LaVallie's supervisor) suggested LaVallie report the matter to the North Dakota Board of Nursing. Harris also suggested that LaVallie report the incident to the Board. Since she had previously been reprimanded for failing to report a nurse to the State Board of Nursing, LaVallie decided

to err on the side of caution and report the potential violation raised by the alteration of medical records.

On November 12, 2002, Cheryl LaVallie informed DesLauriers and Martell that there was an on-going investigation concerning the alteration of medical records in chart # 10051 and that, pending this internal investigation, no overtime would be granted to the employees involved in the matter. LaVallie made the decision to restrict overtime because she felt it was not appropriate to allow the nurses to work overtime or compensatory time during the pendency of the investigation. This restriction was lifted when the IHS investigation was complete, or not later than January 6, 2003.

Thereafter, LaVallie sent her written report to the North Dakota Board of Nursing. The report was dated December 4, 2002. The plaintiffs learned of LaVallie's report to the Board of Nursing in mid-December 2002, when they received notification from the Board that it had received a report with concerns about their nursing practices.

On March 5, 2003, the Disciplinary Review Board for the North Dakota Board of Nursing dismissed the request for an investigation made by Cheryl LaVallie because there was insufficient evidence to support a violation of state law. The records pertaining to the investigation by the Board of Nursing have been destroyed or are otherwise inaccessible to the general public.

On March 7, 2003, DesLauriers and Martell each mailed a "Complaint for Race Discrimination" to the Service Unit Director of IHS. These complaints, which were prepared and submitted by their attorney, were the first contact either DesLauriers or Martell had with the Equal Employment Office of IHS regarding any allegations of discrimination. During her deposition, Martell said that she called EEO Counselor Robert Camper shortly after she received a letter dated December 17, 2002, from the North Dakota Board of Nursing advising her that it had received a report with concerns related to her nursing practice. Martell testified that she "told him that I was having a problem with LaVallie and that she had turned me in to the Board of Nursing." Deposition of Martell, p. 161. According to Martell, Camper suggested that she contact the union which she did. Apparently, Martell did not mention or even suggest employment discrimination during this conversation with Camper. Martell did not contact the IHS Equal Employment Opportunity office with any complaints of discrimination until Martell's lawyer sent the March 7, 2003, Complaint of Discrimination. Martell and her attorney met with EEO counselor Robert Camper on March 24, 2003, regarding her complaint and received a notice of right to file a discrimination complaint the same day. DesLauriers and her attorney met with EEO counselor Robert Camper on March 27, 2003, concerning her complaint of discrimination. DesLauriers also received a notice of right to file a discrimination complaint that same day.

## II. *STANDARD OF REVIEW*

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Graning v. Sherburne County,* 172 F.3d 611, 614 (8th Cir.1999). A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. LEGAL DISCUSSION

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■■■ Title VII prohibits employment discrimination on the basis of race. "All personnel actions affecting employees ... in executive agencies ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). To enforce this statute, an aggrieved employee may file a civil action in federal district court by filing his/her claim of employment discrimination against the agency employer. However, there are certain prerequisites to the filing of such an action. *See Brown v. General Serv. Admin.,* 425 U.S. 820, 832, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); 42 U.S.C. § 2000e–16. Specifically, "[f]ederal employees asserting Title VII claims must exhaust their administrative remedies as a precondition to filing a civil

action in federal district court." *McAdams v. Reno,* 64 F.3d 1137, 1141 (8th Cir.1995); *Morgan v. SPS,* 798 F.2d 1162, 1165 (8th Cir.1986). In other words, an employee cannot bring a discrimination claim without first exhausting his/her administrative remedies. "The requirements for processing employment discrimination claims are complex and merit careful attention by a claimant. Generally, the employee must seek relief from the Equal Employment Opportunity department of the employing agency, as required by the procedures outlined in Section 717(c) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16(c)." *McAdams,* 64 F.3d at 1137, 1141. These procedures include a requirement that a complaining employee contact an EEO counselor within 45 days of an allegedly discriminatory act. *See* 29 C.F.R. § 1614.105(a)(1).

■■■ Thus, it is well-established that timely contact with an EEO counselor is a jurisdictional prerequisite to filing a complaint against the United States in federal court. *See Bailey v. U.S. Postal Service,* 208 F.3d 652, 654 (8th Cir.2000) ("Before bringing discrimination claims, Title VII plaintiffs must exhaust available administrative remedies"). *Briley v. Carlin,* 172 F.3d 567, 570–71 (8th Cir.1999) (upholding the district court's dismissal of a complaint for lack of subject matter jurisdiction because the plaintiff failed to timely consult an EEO counselor within 45 days of the alleged discriminatory act); *Barnes v. Levitt,* 118 F.3d 404, 408 (5th Cir.1997) ("The filing of an administrative complaint is a jurisdictional prerequisite to a Title VII action.").

The United States contends that the Plaintiffs failed to report the alleged discriminatory conduct within the required 45–day time limit and, as a result, the Court lacks jurisdiction and the case should be dismissed. The plaintiffs have

acknowledged that employees must generally contact an EEO counselor within 45 days of the act believed to be discriminatory and file a formal complaint within 15 days after the close of the counseling. *See* Plaintiff's Argument in Support of Motion in Opposition to Defendant's Motion for Summary Judgment, p. 5.

The discriminatory action alleged in the complaint is the report sent by Cheryl LaVallie to the North Dakota Board of Nursing on December 4, 2002. The Board of Nursing notified Martell and DesLauriers of the request for an investigation in a letter dated December 17, 2002. Thus, Martell and DesLauriers had actual knowledge of the actions which they allege were discriminatory on or about December 20, 2002.[1] The 45-day window for reporting the incident would have expired on or about February 4, 2003. The complaints Martell and DesLauriers filed with the EEOC were dated March 7, 2003 and their respective meetings with EEO counselor Robert Camper occurred on March 24, 2003, and March 27, 2003, respectively. It is clear and undisputed that neither Martell nor DesLauriers reported the incident of alleged discrimination within the required time frames of Title VII.

The plaintiffs contend that their contacts with EEO counselor Robert Camper in March 2003 were within the 45-day time limit because the investigation triggered by LaVallie's letter constituted ongoing harassment that did not end until the plaintiffs were notified by the North Dakota Board of Nursing on March 5, 2003, that the investigation had been dismissed.[2] This argument is without merit.

It is clear that it was not the investigation by the North Dakota Board of Nursing which is alleged to be discriminatory. Rather, it was the decision of Cheryl LaVallie, allegedly based upon a racial animus, to send the North Dakota Board of Nursing a letter requesting an investigation into the alteration of medical records. The allegedly discriminatory occurrence is not the dismissal of the request for an investigation made by LaVallie to the Board of Nursing. Instead, it is LaVallie's submission of the December 4, 2002, report to the North Dakota Board of Nursing and the nature of the accusations made in the report. Martell and DesLauriers learned of the report sent by LaVallie no later than mid-December 2002 when they received notification from the North Dakota Board of Nursing. They did not contact the EEO counselor until more than two months later which was long after the 45-day time limit had expired. In this case, the plaintiffs are complaining about one distinct allegedly discriminatory action. The plaintiffs have presented no evidence of an ongoing pattern or practice of racial discrimination in response to this motion. The plaintiffs failed to exhaust their administrative remedies and the matter should be dismissed. The Court need not address the issue of whether the plaintiffs have presented sufficient evidence to preserve their discrimination claims. In summary, the Court concludes that the plaintiffs failed to initiate contact with an EEO counselor within 45 days of the allegedly discriminatory acts and, as such, their Title VII claims must be dismissed for lack of subject matter jurisdiction.

---

1. This assumes three days for the delivery of mail from Bismarck to Belcourt.

2. Martell does not contend that her late December 2002 conversation with EEO counsel Robert Camper constituted a report of discrimination or a request for counseling. The conversation was never logged with the EEO office in Aberdeen, South Dakota, as a report of employment discrimination. Nor do the plaintiffs contend the doctrines of equitable tolling or equitable estoppel apply.

## B. FEDERAL TORT CLAIMS ACT ALLEGATION

The United States also contends that Title VII preempts any claims under the Federal Tort Claims Act. Where a plaintiff alleges facts that are actionable under Title VII and for which Title VII provides a remedy, Title VII preempts virtually all other causes of action that provide consistent theories of relief. *Brown v. GSA,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). This exclusive remedy principle applies when a plaintiff alleges tort claims under either state or federal law. *See Gergick v. Austin,* 997 F.2d 1237, 1239 (8th Cir.1993). The plaintiffs concede that Title VII preempts the Federal Tort Claims Act claim. The Court agrees with the parties and for this reason will order that the claims under the Federal Tort Claims Act be dismissed.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Defendants' Motion for Summary Judgment (Docket No. 16).

**IT IS SO ORDERED.**